# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

THE CINCINNATI INSURANCE
COMPANY,

      Plaintiff,

vs.

NATIONAL UNION FIRE
INSURANCE COMPANY OF
PITTSBURGH, PA.,

      Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:

Case No. 1:17-cv-250

Judge Timothy S. Black

## ORDER RESOLVING CROSS MOTIONS
## FOR SUMMARY JUDGMENT AND
## DEFENDANT'S MOTION TO STRIKE

This civil action is before the Court on Plaintiff The Cincinnati Insurance

Company ("CIC" or "Plaintiff")'s motion for summary judgment (Doc. 17) and the

parties' responsive memoranda (Docs. 21, 23), and Defendant National Union Fire

Insurance Company of Pittsburgh, Pa. ("Defendant" or "National Union")'s motion for

summary judgment (Doc. 12) and the parties' responsive memoranda (Docs. 17, 21).[1]

Also before the Court is National Union's motion to strike (Doc. 22) and the parties'

responsive memoranda (Docs. 25, 27).

---

[1] National Union requested oral argument on the motions for summary judgment.  (Doc. 12 at 1; Doc. 21 at 1).  The Court finds the pleadings are clear on their face, and that oral argument is not necessary. *See Whitescarver v. Sabin Robbins Paper Co*., Case No. C-1-03-911, 2006 U.S. Dist. LEXIS 51524, at *7, 2006 WL 2128929 (S.D. Ohio July 27, 2006) ("Local Rule 7.1(b)(2) leaves the court with discretion to grant a request for oral argument.").

# I.    BACKGROUND

The parties agree that there is no outstanding dispute of material fact.[2]  This case

arises out of a May 26, 2015 fire at an apartment building located at 6020 Dahlgren Street

in Cincinnati, Ohio (the "Building").  (Doc. 13-2 at ¶ 1).  Firefighters were dispatched to

the Building, and Daryl E. Gordon, a firefighter, was killed responding to the fire.  (*Id.*

at ¶ 2; Doc. 18-1 at ¶ 3).

During the relevant timeframe, The Community Builders, Inc. ("TCB") owned the

building.  (Doc. 18-1 at ¶ 2).  Wallick Properties Midwest LLC ("Wallick"), managed the

building for TCB, pursuant to a Management Agreement.  (Doc. 18-1 at ¶ 3; Doc. 3-1).

The Management Agreement between TCB and Wallick contained the following

provision regarding insurance:

> <u>Insurance</u>. The Owner [TCB] will inform the Agent [Wallick] of
> insurance to be carried with respect to the Project and its operations
> and the Owner will cause such insurance to be placed and kept in
> effect at all times. The Agent will pay premiums out of the Rental
> Agency Account and premiums will be treated as operating
> expenses. All insurance will be placed with such companies, or such
> conditions, in such amounts and with such beneficial interests
> appearing thereon as shall be acceptable to the Owner and
> Consenting Parties and shall be otherwise in conformity with the
> mortgage; provided that the same will include public liability
> coverage, with the Agent designated as one of the insured, in
> amounts acceptable to [Wallick] as well as [TCB] and the
> Consenting Parties. [Wallick] will investigate and furnish [TCB]
> with full reports as to all accidents, claims and potential claims for

---

[2] Pursuant to the Standing Order of the Court, the Plaintiff and Defendant filed Statements of
Proposed Undisputed Facts.  (Docs. 13-2 and 18-1, respectively).  Plaintiff and Defendant then
each filed a Response to Proposed Statement of Undisputed Facts and a Statement of Disputed
Issues of Material Fact.  (Docs. 20 and 21-1, respectively).  The Court's statement of facts set
forth here incorporates the facts undisputed by the parties and the facts confirmed by the Court
upon review of the citations to the evidentiary record provided by the parties.

> damages relating to the Project and will cooperate with [TCB's]
> insurers in connection therewith.

(Doc. 3-1 at PAGEID # 409). Therefore, under the Management Agreement, TCB was required to secure insurance that designated Wallick as an insured. Wallick was also required to cooperate with TCB's insurers.

Liberty Mutual Insurance/American Economy Insurance Company ("Liberty Mutual") issued a Commercial Package Policy (the "Liberty Mutual Policy"). Wallick qualified as an "insured" under the Liberty Mutual Policy. (Doc. 13-2 at ¶ 8).

Gordon's estate brought claims against TCB and Wallick, among others. The claims were settled with contributions from multiple insurers, including CIC and National Union. (Doc. 18-1 ¶¶ 4–5). Liberty Mutual contributed to the settlement of Gordon's claims on behalf of Wallick until its primary policy was exhausted. (Doc. 13-2 at ¶ 11). CIC paid $1,000,000, its policy limit, on behalf of Wallick as part of the settlement. (Doc. 3 at ¶ 5).

CIC claims that the insurance policies issued by itself and National Union are both excess policies and therefore National Union should contribute to the settlement on a pro rata basis. National Union argues that the policy it issued is in excess to CIC's policy and therefore is not required to contribute to CIC's settlement payment. Therefore, the Court will next examine the relevant portions of the insurance policies at issue.

## A.    CIC Policy

CIC issued a policy to Wallick with a "Commercial General Liability Coverage Part" for the period June 24, 2014 to June 24, 2015 (the "CIC Policy"). (Doc. 18-1 at ¶ 6;

Doc. 12-3). CIC originally issued an insurance policy to Wallick on June 24, 2009.

(Doc. 18-1 at ¶ 17). The CIC policy has a per occurrence limit of $1,000,000. (Doc. 18-1 at ¶ 7). The "Insuring Agreement" section of the CIC Policy provides in relevant part:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.

(Doc. 12-3 at PAGEID # 657).

The "Commercial General Liability Conditions" section of the CIC Policy includes an "Other Insurance" provision providing:

> **5. Other Insurance**
>
> If other valid and collectible insurance is available to the insured for a loss we cover under COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY or COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY of this Coverage Part, our obligations are limited as follows:
>
>> a. **Primary Insurance**
>>
>> This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by method described in c. below.
>>
>> b. **Excess Insurance**
>>
>> This insurance is excess over:
>> …

4

(2)     Any other primary insurance available to the
insured covering liability for damages arising out
of the premises or operations, or the products and
completed operations, for which the insured have
been added as an additional insured by attachment
of an endorsement.

(*Id.* at 670–71).

The CIC Policy also contains the following endorsement (the "Real Estate

Property Managed Endorsement," or the "Endorsement"):

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**REAL ESTATE PROPERTY MANAGED**

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

This insurance does not apply to "property damage" to property you
operate or manage or as to which you act as agent for the collection of rents
or in any other supervisory capacity

With respect to your liability out of your management of property for which
you are acting as real estate manager this insurance is excess over any other
valid and collectible insurance available to you.

(*Id.* at 701). The Real Estate Property Managed Endorsement was added to the CIC

Policy in 2012. (Doc. 18-1 at ¶¶ 22–23).

The CIC Policy reflects a "Commercial General Liability Coverage Part" premium

of $145,558. (Doc. 12-3 at 494). The premium charged under the CIC policy for

coverage provided by the "Real Estate Property Managed Endorsement" was $1,957.00.

(Doc. 12-3 at 723).

The Schedule of Locations (the "Schedule of Locations", Doc. 13-3, at PAGEID

# 869–76) lists all the properties covered by the Commercial General Liability Coverage Part. The Building is not listed on the Schedule of Locations. It is undisputed that Wallick was acting as a real estate manager for the Building.

Finally, the CIC Policy contains the following "Method of Sharing" provision:

> If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.
>
> If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limits of insurance to the total applicable limits of insurance of all insurers.

(Doc. 12-3 at PAGEID # 671).

## B.     National Union Policy

National Union issued an Umbrella Policy to TCB for the period May 1, 2014 to May 1, 2015 (the "National Union Policy"). (Doc. 12-4). Wallick also qualified as an insured under the National Union Policy. (Doc. 13-2 at ¶ 12). The National Union Policy has a limit of $25,000,000. (Doc. 12-4 at PAGEID # 740). The National Union Policy Reflects a premium of $314,112.00 or $12,564.48 per $1,000,000 of coverage. (*Id.*). The "Insuring Agreement" section of the National Union Policy provides in relevant part:

**INSURING AGREEMENT – COMMERCIAL UMBRELLA LIABILITY**

> **A.** We will pay on behalf of the **Insured** those sums in excess of the **Retained Limit** that the Insured becomes legally obligated to pay as damages by reason of liability imposed by law because of **Bodily Injury,** Property **Damage** or **Personal Injury** and **Advertising Injury** to which this insurance applies or because of **Bodily Injury** or

**Property Damage** to which this insurance applies assumed by the **Insured** under an **Insured Contract.**

(*Id.* at 741).

The National Union Policy includes the following "Limits of Insurance" provisions:

### LIMITS OF INSURANCE

…

**F.** This policy applies only in excess of the **Retained Limit**. If however, a policy shown in the Schedule of Underlying Insurance forming a part of this policy has a limit of insurance:

    1. greater than the amount shown in such schedule, this policy will apply in excess of the greater amount of valid and collectible insurance; or

    2. less than the amount shown in such schedule, this policy will apply in excess of the amount shown in the Schedule of Underlying Insurance forming a part of this policy.

**G.** If the total applicable limits of Scheduled Underlying Insurance are reduced or exhausted by the payment of Loss to which this policy applies and the total applicable limits of applicable Other Insurance are reduced or exhausted, we will:

    1. in the event of reduction, pay excess of the remaining total applicable limits of Scheduled Underlying Insurance and any applicable Other Insurance; and

    2. in the event of exhaustion, continue in force as underlying insurance

…

**M.** We will not make any payment under this policy unless and until:

    1. the total applicable limits of **Scheduled Underlying Insurance** have been exhausted by the payment of **Loss** to which this policy

applies and any applicable, **Other Insurance** have been exhausted by the payment of **Loss**; or

2. the total applicable **Self-Insured Retention** has been satisfied by the payment of **Loss** to which this policy applies

When the amount of **Loss** has been determined by an agreed settlement or a final judgment, we will promptly pay on behalf of the **Insured** the amount of such **Loss** falling within the terms of this policy.  An agreed settlement means a settlement and release of liability signed by us, the **Insured** and the claimant or the claimant's legal representative.

(*Id.* at 744–45).

The National Union Policy includes an "Other Insurance" provision providing:

**L.  Other Insurance**

If other valid and collectible insurance applies to damages that are also covered by this policy, this policy will apply excess of the Other Insurance.  However, this provision will not apply if the Other Insurance is specifically written to be excess of this policy.

(*Id.* at 756).

The Liberty Mutual Policy is listed in the Schedule of Underlying Insurance in the National Union Policy.  (Doc. 13-2 at ¶ 11).

## II.  MOTION TO STRIKE

As an initial matter, National Union moves to strike statements in the Affidavits of Colleen M. Blandford (the "Blandford Affidavit", Doc. 13-5), William D. Kientz (the "Kientz Affidavit", Doc. 13-4), and Priscilla Mueller (the "Mueller Affidavit", Doc. 13-3), and exhibits attached thereto.  (Doc. 22).

The Federal Rules of Civil Procedure do not provide for a motion to strike documents other than pleadings.  *See* Fed. R. Civ. P. 12(f) (limited to striking pleadings

or portions of pleadings). "Instead trial courts make use of their inherent power to control their dockets, *Anthony v. BTR Auto. Sealing Sys.,* 339 F.3d 506, 516 (6th Cir. 2003), when determining whether to strike documents or portions of documents." *Getachew v. Cent. Ohio Transit Auth.*, No. 2:11-cv-860, 2013 WL 819733, at *2 (S.D. Ohio Mar. 5, 2013). Therefore, striking a portion of an affidavit or exhibits attached to the affidavit lies in the trial court's sound discretion. *Aerel S.R.L. v. PCC Airfoils, LLC,* 448 F.3d 899, 906 (6th Cir. 2006). Rule 56(e) requires that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). Affidavits that do not satisfy the requirements of Rule 56(e) are subject to motions to strike. *Reddy v. Good Samaritan Hosp. & Health Ctr.,* 137 F. Supp. 2d 948, 954 (S.D. Ohio 2000).

### A. Extrinsic Evidence

National Union argues that portions of the Kientz and Mueller Affidavits should be struck because CIC seeks to offer extrinsic evidence to interpret the plain language of the CIC Policy. (Doc. 22 at 11–13). In interpreting an insurance policy under Ohio law, a court may not "consider extrinsic evidence unless and until it has determined that contract language is ambiguous." *Cafaro Bradford Tuller Square, LLC v. PetSmart, Inc.*, 2012 WL 2681378, at *6 (N.D. Ohio July 6, 2012).

Here, there is no ambiguity in the CIC Policy, therefore the Court will not consider any extrinsic evidence offered for the purpose of interpretation of the insurance policy. To the extent that the Kientz and Mueller Affidavits contain impermissible extrinsic

evidence, the Court will not consider such statements.

**B.  Legal Conclusions**

National Union argues that portions of the Mueller Affidavit should be struck for offering legal conclusions.  (Doc. 22 at 2–3).  "'It is well settled that Courts should disregard conclusions of law (or 'ultimate fact') found in affidavits' submitted for summary judgment."  *Harrah's Entm't, Inc. v. Ace Am. Ins. Co.,* 100 F. App'x 387, 394 (6th Cir. 2004) (quoting *F.R. C. Int'l, Inc. v. United States,* 278 F.3d 641, 643 (6th Cir. 2002)).  National Union contends that the Mueller Affidavit impermissibly attempts to interpret the scope of the policy, and in particular the Real Estate Property Managed Endorsement, which is a matter of law and thus within the purview of the court.  *See Skinner v. Guarantee Tr. Life Ins. Co.*, 813 F. Supp. 2d 865, 868 (S.D. Ohio 2011) ("the interpretation of an insurance contract is a question of law"); *LuK Clutch Sys., LLC v. Cent. Indem. Co.*, 805 F. Supp. 2d 370, 376 (N.D. Ohio 2011) ("An insurance policy is a contract, and its interpretation is a matter of law for the court.").  As the Court noted above, there is no ambiguity in the CIC policy, and the Court will not consider extrinsic evidence to interpret the CIC Policy.

The Court finds that the Mueller Affidavit includes some statements regarding whether the CIC Policy provides "primary coverage" or "excess coverage" that impermissibly offer legal conclusions.  For example, the Mueller Affidavit states that "[t]he premium charged for the excess coverage provided by the Real Estate Property Managed Endorsement was $1,957."  (Mueller Affidavit at ¶ 17).  Whether or not the Endorsement provided "excess coverage" is a matter of law for the Court and is an

inappropriate legal conclusion by an affiant. *See The Way Intern. Inc. v. Exec. Risk Indem. Inc.*, 2009 WL 3157403, at *3 (S.D. Ohio Sep. 28, 2009) (striking expert report that included inappropriate legal conclusions such as "the manner in which certain critical provisions of Plaintiffs' insurance contract with Defendant [] should be interpreted.") However, the fact that a premium of $1,957 was charged for those properties covered by the Real Estate Property Managed Endorsement is not a legal conclusion and is included in the CIC Policy. (Doc. 12-3 at PAGEID # 656).

Here, even though certain portions of the Mueller Affidavit offer legal conclusions, the Court does not need to strike the affidavit and will "consider such statements for whatever value (if any) they possess in the summary judgment context." *Ortiz v. Anchor Realty Const., Inc.*, 2011 WL 2441918, at *4 (S.D. Ohio June 14, 2011); *see also Carl Kelley Constr. LLC v. WTNM Tech., Ltd.,* No. CIV 08–0379 JB/RLP, 2009 WL 1312904, at *1 (D.N.M. Jan. 5, 2009) ("Certain aspects of the challenged paragraphs can be understood as making legal conclusions. The Court does not need to strike the affidavit, however, because the affidavit contains legal conclusions. The Court will come to its own determination of the legal issues involved in this case.").

## C. Hearsay

National Union argues that portions of the Blandford and Mueller Affidavits should be struck because they contain inadmissible hearsay. (Doc. 22 at 8–11). "Hearsay evidence may not be considered on summary judgment." *Jacklyn v. Schering Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 927 (6th Cir. 1999)

National Union identifies the following paragraphs of the Blandford and Mueller

Affidavits as containing inadmissible hearsay. The Court will address each in turn.

### i. Blandford Affidavit ¶ 11

11. Liberty Mutual agreed Wallick was an insured under the policy issued to TCB; agreed its policy was primary; provided Wallick defense and indemnity; and contributed to the settlement of the firefighter's claim on behalf of Wallick, providing primary coverage until its policy was exhausted. (Blandford Affidavit at ¶ 11).

The Court finds that this is inadmissible hearsay to the extent that it is offers to

prove the position of Liberty Mutual regarding how it interpreted the Liberty Mutual

Policy. Nevertheless, Blandford filed a second affidavit (Doc. 24) that states:

4. Wallick was an insured under the Liberty Mutual policy issued to TCB, and Liberty Mutual provided Wallick defense and indemnity and contributed to the settlement of the firefighter's claim on behalf of Wallick, without contribution from CIC or National Union, until its policy was exhausted.

The Court finds that this revised statement does not include inadmissible hearsay.

### ii. Mueller Affidavit ¶¶ 8, 14 (Doc. 13-3)

8. Beginning in 2012, Wallick requested limited coverage from CIC for locations such as the Dahlgren property – properties which Wallick managed but which were owned by someone else who provided primary general liability insurance for those properties.

14. ISO has indicated that the coverage provided by the Real Estate Property Managed Endorsement "is excess over any other available insurance, regardless if the other insurance is primary or excess." (*See* Exhibits C and D, www.claimsjournal.com and https://paas.iso.com).

(*Id.* at ¶ 14).

National Union also seeks to strike Exhibits C and D attached to the Mueller

Affidavit as hearsay and for lack of proper authentication. Exhibits C and D contain statements from the website of ISO, a source of information about property/casualty insurance, regarding coverage provided by the Real Estate Property Managed Endorsement.

The Court finds that, to the extent these statements are offered to explain CIC's intents and purposes in drafting the CIC Policy, they are not hearsay. However, these statements would then be offered as extrinsic evidence to interpret the CIC Policy. As discussed above, the Court will not consider extrinsic evidence to interpret the unambiguous terms of the CIC Policy. Therefore, the Court will not consider statements in Paragraphs 8 and 14 of the Mueller Affidavit, nor Exhibits C and D attached thereto, in in analyzing the motions for summary judgment.

### D. Authentication

Finally, National Union argues that the Schedule of Locations, attached as Exhibit A to the Mueller Affidavit, should be stricken for lack of authentication. (Doc. 13-3 at PAGEID # 869–76). National Union contends that Mueller fails to explain the origin of the Schedule of Locations or where she obtained it. National Union relies on *Papalios v. General Motors, LLC*, 2017 WL 5998899 (N.D. Ohio Dec. 4, 2017) to support its argument that the Schedule of Locations should be struck for lack of authentication.

In *Papalios*, the court found that the offered document was not self-authenticating under Rule 901(b)(4) because the plaintiff did not offer any evidence that the document was generated by the defendant. *Id.* at *8. Importantly, however, the court only addressed whether the document was self-authenticating because the plaintiff had not

filed an authenticating affidavit with the offered document.

Here, the Plaintiff does not contend that the Schedule of Locations is self-authenticating, but attached it to an authenticating affidavit. The Mueller Affidavit is based on her personal knowledge as she participated in the creation of the Schedule of Locations. Therefore, the Schedule of Locations is clearly authenticated and is admissible evidence.

Accordingly, for the reasons outlined above, National Union's motion to strike (Doc. 22) is granted in part and denied in part. The Court will only consider admissible evidence in its consideration of the motions for summary judgment.

## III.    SUMMARY JUDGMENT

### A.  Standard of Review

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that

there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

## B. Analysis

At issue before the Court is whether the National Union Policy is in excess to the CIC Policy. National Union argues that the National Union Policy is a true umbrella policy, and thus is in excess to all other policies. National Union also contends the CIC Policy does not provide disparate coverage relative to the Schedule of Locations. CIC argues that, while the CIC Policy provided primary coverage related to properties included on a Schedule of Locations, the Building was covered by the Real Estate Property Managed Endorsement, which provides excess coverage.

It is not in dispute that the Building is not included on the Schedule of Locations and that Wallick was acting as a real estate manager for the Building. As the facts are not disputed, the Court is "presented solely with a question of law concerning the correct construction" of the National Union and CIC Insurance Policies. *Advance Watch Co. Ltd. V. Kemper Nat. Ins. Co.*, 99 F.3d 795, 799 (6th Cir. 1996). Therefore, the Court must consider whether the Real Estate Property Managed Endorsement modifies the CIC Policy to provide excess coverage for liabilities arising out of Wallick's management of property as a real estate manager.

### 1. Real Estate Property Managed Endorsement

It is undisputed that the CIC Policy is generally a primary policy and is titled a "general liability" policy. CIC contends, however, that the CIC Policy was modified in 2012 by the Real Estate Property Managed Endorsement to provide excess coverage for certain properties managed by Wallick. Above the Endorsement, the CIC Policy states,

in bold capital letters: "**THIS ENDORSEMENT CHANGES THE POLICY.**

**PLEASE READ IT CAREFULLY.**"  (Doc. 12-3 at PAGEID # 701).  The Endorsement

then provides in relevant part:

> With respect to your liability out of your management of property
> for which you are acting as real estate manager this insurance is
> excess over any other valid and collectible insurance available to
> you.

(*Id.*)

In its analysis of an insurance policy, a court "may not render any term

meaningless." *Miller v. Federal Insurance Co.*, 2012 WL 12868303, at *5 (N.D. Ohio

May 31, 2012) (citing *Hybud Equip. Corp. v. Sphere Drake Ins. Co. Ltd.,* 597 N.E.2d

1096, 1002-03 (Ohio 1992).  Therefore, the Court must give effect to the terms of the

Endorsement.

In interpreting an insurance policy, it is well established that the "[r]ules of

construction dictate that the endorsement terms control." *Baker v. Aetna Cas. & Sur. Co.,*

107 Ohio App. 3d 835, 843, 669 N.E.2d 553, 558–59 (1995) (citing *Workman v. Republic*

*Mut. Ins. Co.* (1944), 144 Ohio St. 37, 46, 28 O.O. 564, 568, 56 N.E.2d 190, 194 ("the

endorsement must be regarded as a modification of the terms of the original contract of

insurance if a clear inconsistency appears")).  Thus, the terms of the Endorsement control

over other provisions of the CIC Policy.

The Court is unaware of any courts applying Ohio law analyzing real estate

property managed endorsements such as the one in this case. National Union points to

two cases that have found that umbrella policies are in excess to policies that are

modified by real estate property managed endorsements.  *See Treder ex rel. Weigel v. LST, Ltd. P'ship*, 271 Wis. 2d 772, 783–84 (Wis. App. 2004); *N. Am. Capacity Ins. Co. v. Colony Specialty v. Hartford Acc. & Indem. Co.*, 273 F. Supp. 3d 711, 717–18 (S.D. Tex. Aug. 7, 2017).  However, those cases are distinguishable from the present case.

In *Treder*, the court in part found that the insurance policy containing the endorsement was not a true excess policy because it was "intended to be a primary policy."  *Treder*, 271 Wis.2d at 783.  While here the Court is not considering extrinsic evidence—such as the intent of the parties—because the CIC Policy is unambiguous, the Court notes that CIC has presented evidence that the properties covered by the Endorsement were intended to provide excess coverage.  In *Hartford*, the court found that the insurance policy containing the endorsement was "excess by coincidence" because true excess policies require a policy holder to obtain primary insurance in addition to an excess policy.  *Hartford*, 273 F. Supp. 3d at 715.  Here, Wallick did have primary insurance coverage for the Building and, as discussed below, the Court finds that the CIC Policy was a "true excess" policy and not "excess by coincidence."

Even if *Treder* and *Hartford* were not distinguishable, a significant majority of courts have found that real estate property management endorsements—<u>identical</u> to the Endorsement before the Court—modify the insurance agreements and make the policies excess for any liabilities arising out of the endorsements.  *See, e.g.*, *Atain Specialty Ins. Co. v. Sierra Pac. Mgmt. Co.*, 725 F. App'x 557, 559 (9th Cir. 2018) (affirming district court's finding that real estate property managed endorsement rendered a policy's coverage excess); *Rock Hill Insurance Co. v. Northfield Insurance Co.*, 297 F. Supp. 3d

1279, 1285 (M.D. Fla. 2017) (finding that real estate property managed endorsement made defendant's policy excess); *Pub. Serv. Mut. Ins. Co. v. Capitol Transamerica Corp.*, 756 F. Supp. 2d 920, 927 (N.D. Ill. 2010) (finding that "[b]oth PSM's 'other insurance' clause and Capitol's real estate property management endorsement are 'excess' clauses" and concluding that the policies were mutually repugnant); *Tudor Ins. Co. v. Am. Cas. Co. of Reading Pennsylvania*, 274 F. Supp. 3d 1278, 1284–86 (N.D. Fla. 2017) (finding that property management endorsement limited coverage to excess); *Peerless Ins. v. Vermont Mutual Ins. Co.,* 151 N.H. 71, 849 A.2d 100, 102 (2004) (finding that a real estate property management endorsement was a "true excess" provision and concluding that an "other insurance" provision and a real estate property management endorsement were "mutually repugnant"); *Am. Econ. Ins. Co. v. Acceptance Ins. Co.*, No. CV 2003 2536, 2004 WL 1080213, at *4 (Idaho Dist. Mar. 26, 2004) (holding that real estate property management endorsement clearly and unambiguously modified an insurance agreement to make the policy excess).

This Court finds that the CIC Policy plainly states the agreement between Wallick and CIC. Here, the language of the Endorsement clearly and unambiguously provides that, for any liability arising out of Wallick's management of property for which it was acting as a real estate manager, the CIC Policy provides excess coverage over any other insurance. The Court agrees with the majority of courts that find that the terms of the Real Estate Property Managed Endorsement make the CIC Policy a true excess policy for properties where Wallick is acting as a real estate manager. Therefore, CIC's coverage of the Building is excess to any other valid and collectible insurance.

The Court notes that in its summary judgment brief, National Union argues that the premiums of the CIC Policy and National Union Policy support the conclusion that the National Union Policy is in excess to the CIC Policy. Because excess policies provide special coverage not normally applicable except for in cases of catastrophic loss, premiums charged under such policies are substantially lower than premiums charged for a primary policy. *See Treder*, 271 Wis.2d at 785. National Union highlights that the $1,000,000 CIC Policy reflects a "Commercial General Liability Coverage Part" premium of $145,558 (Doc. 12-3 at PAGEID # 494), whereas the $25,000,000 National Union Policy reflects a premium of $313,112.00, or $12,564.48 per $1,000,000 of coverage. (Doc. 12-4 at PAGEID # 740). National Union emphasizes that this is "one-tenth the Cincinnati premium per dollar of coverage." (Doc. 12 at 17). However, in CIC's summary judgment brief, CIC makes clear that National Union failed to note that the premium charged by CIC under the Endorsement was only $1,957. (Doc. 12-3 at 723). National Union abandons this line of argument in its subsequent briefing. Therefore, the premium charged under the CIC Endorsement was significantly less per $1,000,000 than the National Union Policy. This further evinces the Court's finding that, as modified by the Endorsement, the CIC Policy provides true excess coverage.

## 2. The CIC and National Union Policies Provide Coverage Pro Rata

Both the National Union Policy (through its "Other Insurance Provision" (Doc 12-4 at PAGEID # 856)) and CIC Policy (through the Endorsement) provide excess coverage for the same risk, the firefighter's claims. Therefore, the Policies are mutually repugnant.

The Supreme Court of Ohio holds that "where two insurance policies cover the same risk and both provide that their liability with regard to that risk shall be excess insurance over other valid, collectible insurance, the two insurers become liable in proportion to the amount of insurance provided by their respective policies." *Buckeye Union Ins. Co. v. State Auto. Mut. Ins. Co.*, 49 Ohio St. 2d 213, 218, 361 N.E.2d 1052, 1055 (1977). Because the Policies are mutually repugnant and both National Union and CIC are proportionally liable, each party is liable for the $1,000,000 settlement on a pro rata basis.

Additionally, the CIC Policy's "Method of Sharing" provision requires that the National Union and CIC provide coverage on a pro rata basis. That provision states:

> If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.
>
> If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limits of insurance to the total applicable limits of insurance of all insurers.

(Doc. 12-3 at PAGEID # 671). The National Union Policy does not contain a provision addressing the method of sharing.

Here, in light of the fact that the National Union Policy and CIC Policy are mutually repugnant, and CIC's "Method of Sharing" provision that permits contribution by equal shares, the Court find that National Union and CIC must provide coverage on a pro rata basis.

### A.     CONCLUSION

Accordingly, for the reasons outlined above:

1) Defendant's motion to strike (Doc. 22) is **GRANTED in part** and **DENIED in part**;

2) Defendant's motion for summary judgment (Doc. 12) is **DENIED**;

3) Plaintiff's motion for summary judgment (Doc. 17) is **GRANTED;** and

4) The Clerk shall enter judgment accordingly, whereupon this case is **TERMINATED** from the docket of this Court.

**IT IS SO ORDERED.**

Date:      _3/28/19_____

_Timothy S. Black_____
Timothy S. Black
United States District Judge